IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| RODNEY GREEN and CHARLAN GREEN, ) | |
| ) | |
| Plaintiffs. ) | |
| ) | |
| v. ) | Case No. 04-0691-CV-W-GAF |
| ) | |
| DILLARD'S, INC. ) | |
| ) | |
| Defendant. ) | |

## ORDER

Presently before the Court is a Motion for Summary Judgment filed by the Defendant, Dillard's, Inc. ("Dillard's"). (Doc. #128). The Plaintiffs, Rodney Green and Charlan Green (collectively "the Greens"), who are African-American, claim that Dillard's violated 42 U.S.C. § 1981 ("§ 1981") when one of its sales clerks uttered a single racial epithet which the Greens overheard while shopping at Dillard's Metro North store in Kansas City, Missouri. Dillard's asserts that there are no genuine issues of material fact and it is entitled to judgment as a matter of law because the Greens have failed to prove that Dillard's intended to discriminate against them on the basis of their race and interfered with their actual ability to enter into a contract. (Doc. #129). The Greens oppose this Motion contending that genuine issues of material fact exist which preclude summary judgment. (Doc. #134). Upon careful consideration of the facts and arguments presented by the parties, the Court finds that there are no genuine issues of material fact for trial and Dillard's is entitled to judgment as a matter of law because the Greens have failed to put forth sufficient evidence that Dillard's unlawfully interfered with their right to make and enforce a contract. Accordingly, Dillard's Motion for Summary Judgment is GRANTED.

## DISCUSSION

I. **Facts**

On Sunday afternoon, August 11, 2002, the Greens visited the Dillard's Metro North store with the intention of purchasing a handbag and a watch for Mrs. Green.[1] (Doc. #129, ¶ 20; Doc. #134, PSF1). When they arrived at Dillard's, the Greens proceeded to the watch counter in the accessories department where they attempted to obtain service from a clerk, Linda McCrary ("McCrary"). (Doc. #129, ¶ 21; Doc. #134, PSF3, ¶21). According to the Greens, McCrary "refused" to help them. (Doc. #129, ¶ 23; Doc. #134, PSF3). Another Dillard's sales associate, Veronica Aguero ("Aguero"), volunteered to assist the Greens and Aguero and the Greens proceeded to the purse counter. (Doc. #129, ¶ 23; Doc. #134, PSF3).

Aguero assisted Mrs. Green in selecting a purse, wallet and keychain. (Doc. #129, ¶ 24; Doc. #134; PSF4). The Greens contend that McCrary followed them to the purse counter and continued to stare at them while Mrs. Green made her selections. (Doc. #134, PSF4). Mr. Green contends that McCrary asked Aguero, loudly enough so that the Greens could hear: "Are they getting all that?" and "How are they paying for it?" (Doc. #134, ¶ 30). Mr. Green then tendered a check for $555.62 to Aguero to purchase the purse and matching accessories. (Doc. #134, PSF4).

After accepting and validating Mr. Green's check and placing it in the register, Aguero placed the receipt and the purchased items in a Dillard's bag and placed the bag on the counter so that it could be taken by the Greens. (Doc. #129, ¶¶ 25-26). Neither Mr. Green nor Mrs. Green actually picked up the

---

[1] These facts are derived from a joint reading of the facts provided by the parties. The Court does not find these facts to be in dispute unless otherwise indicated.

bag. (Doc. #134, ¶ 25). Mr. Green contends that throughout this incident, "although other customers needed help, McCrary did not assist them." (Doc. #134, ¶ 30). Mr. Green asserts that he was uncomfortable with McCrary's staring and that another customer was waiting so he said to McCrary, "Ma'am, there's other people. Can you help somebody else?" Id. McCrary responded, "I can, but I'm not." Id.

Aguero then asked Mrs. Green if there was anything else she could do for them and Mrs. Green indicated that she wanted to look at a watch. (Doc. #129, ¶ 27; Doc. #134, PSF4). Mrs. Green and Aguero went over to the watch counter. (Doc. #129, ¶ 28, Doc. #134, PSF4). Meanwhile, Mr. Green stayed behind at the purse counter and "started focusing" on McCrary. (Doc. #129, ¶ 29; Doc. #134, PSF4). Mr. Green contends that McCrary "continued to stare" at him. (Doc. #134, PSF4). When Mr. Green attempted to reassure McCrary that he was not there to shoplift, McCrary declared, "fucking niggers," and "angrily walked off." (Doc. #129, ¶ 29; PSF4). Mrs. Green also heard the racial epithet. (Doc. #134, ¶ 30). Aguero never heard McCrary make this statement. (Doc. #129, ¶ 30; Doc. #134, ¶ 30).

Mr. Green asked Aguero to call a manager and she did. (Doc. #129, ¶ 31; Doc. #134, ¶ 31). The Greens contend that Amanda Andreasen ("Andreasen"), Dillard's Area Sales Manager, arrived just as McCrary was walking off the floor. (Doc. #129, ¶ 31; Doc. #134, ¶ 31). Andreasen testified that when she arrived in the department, Mr. Green told her that he had been treated rudely by McCrary, but would not state specifically what McCrary had allegedly said to him, other than it was "some prejudice remark." (Doc. #129, ¶ 32). Mr. Green maintains that he told Andreasen about the entire incident and specifically

3

told her that McCrary had called him and his wife "fucking niggers."[2] (Doc. #134, ¶ 32). Aguero and Andreasen apologized for McCrary's alleged behavior.[3] (R. Green Dep. 102:20-103:11; C. Green Dep. 29:4-11).

At that point, neither Mr. Green nor Mrs. Green asked to look at the watch or attempted to make a purchase. (R. Green Dep. 153:25-154:17). Mr. Green testified that "[n]o one was – was even thinking about buying or selling anything after that incident." (R. Green Dep. 153:13-24). Instead, Mr. Green asked Andreasen to return his $555.62 check. (R. Green Dep. 154:18-155:6). Andreasen retrieved the check from the cash register and wrote her name and the name of the Store Manager, David Bousum ("Bousum"), on the back. (Doc. #129, ¶ 35; Doc. #134, ¶ 35). Mr. Green also wrote the name of the Assistant Store Manager, Anita Harrold, on the back of the check. Id.

The Greens contend that they did not "return" the purse, wallet and key chain and none of the items were "scanned back in." (Doc. #134, ¶ 36). Furthermore, the Greens assert that no "refund" was issued but rather the check that had been placed in the cash register was simply returned to them. Id. The Greens admit that the check had been validated, but emphasize that there had been no electronic transfer of funds. Id. The Greens reiterate that the Dillard's bag containing the items which was placed on the counter so the Greens could take it, remained on the counter and the Greens never picked it up. Id.

---

[2]The Greens maintain that this is a disputed material fact which precludes summary judgment. (Doc. #134, ¶ 30). However, for purposes of this motion, the Court will view the facts in the light most favorable to the Greens and presume that Mr. Green specifically told Andreasen that McCrary had referred to him and his wife as "fucking niggers." This fact does not affect the Court's conclusion that the Green's failed to present sufficient evidence that Dillard's voluntarily interfered with the Green's right to make and enforce a contract.

[3]McCrary was terminated on August 12, 2005, the day after the incident involving the Greens, for her rude treatment of customers. (Doc. #129, ¶¶ 39-41; Doc. #134, ¶¶ 39-41).

4

The Greens voluntarily left the store after their check was returned. (Doc. #129, ¶ 36; Doc. #134, ¶ 36). Although the Greens did not fill out a customer complaint card, they made an oral complaint and spoke with Bousum in the days following the incident. (Doc. #129, ¶ 37; Doc. #134, ¶ 37). Bousum attempted to contact the Greens on Monday, August 12, 2002 and Mrs. Green eventually returned his call two days later. (Doc. #129, ¶ 42; Doc. #134, ¶ 42). Bousum apologized for the incident and invited the Greens to return to the store to purchase the purse, wallet and key chain at a discount of 20 or 25 percent. (Doc. #129, ¶ 43; Doc. #134, ¶ 43). Mrs. Green, however, felt that Dillard's should have offered to give them the items free of charge. (Doc. #129, ¶ 44; Doc. #134, ¶ 44). Within a few days after the incident, the Greens received a letter of apology from Bousum with an invitation to return and purchase the merchandise at a discount. (Doc. #129, ¶ 45; Doc. #134, ¶ 45). The Greens assert that they were too humiliated to return. (Doc. #134, ¶ 45).

Dillard's has moved for summary judgment arguing that the Greens actually made and enforced a contract with Dillard's when Aguero sold the Greens the purse. (Doc. #129). Dillard's further argues that several of its employees and managers assisted or offered to assist the Greens in purchasing the items as well as returning the items. Id. Finally, Dillard's contends that Mr. Green's allegation that a clerk made a discriminatory comment does not as a matter of law deny an actual contract. Id.

The Greens contend that genuine issues of material fact exist regarding whether or not it made and enforced a contract with Dillard's. (Doc. #134). According to the Greens, McCrary's comment precluded them from entering into a retail sales transaction with Dillard's. Id. The Greens argue that they did not "purchase" the purse because their check was returned before the funds were electronically

5

transferred. Id. Finally, the Greens contend that McCrary's refusal to serve them, despite the fact that they were assisted by Aguero, is sufficient to support Dillard's liability under § 1981.

**II.     Standard**

Dillard's filed this Motion for Summary Judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. According to this Rule, summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering this Motion, the Court views all facts in the light most favorable to the Greens and gives them the benefit of all reasonable inferences. *See* Prudential Ins. Co. v. Hinkel, 121 F.3d 364, 366 (8th Cir. 1997). The Court will not weigh the credibility of the evidence, but rather will focus on whether a genuine issue of material fact exists for trial. Roberts v. Browning, 610 F.2d 528, 531 (8th Cir. 1979); United States v. Porter, 581 F.2d 698, 703 (8th Cir. 1978).

An issue of material fact is "genuine" if "the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). When the evidence supports conflicting conclusions, a *genuine* issue of material fact exists and summary judgment should be denied. Kells v. Sinclair Buick—GMC Truck, Inc., 210 F.3d 827 (8th Cir. 2000) (emphasis added). The "materiality" of a disputed fact is determined by the substantive law governing the claim. Anderson, 477 U.S. at 248. "Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material." Liebe v. Norton, 157 F.3d 574, 578 (8th Cir. 1998) *citing* Anderson, 477 U.S. at 248.

6

Dillard's bears the burden of proving the absence of disputed material facts. *See* Prudential Ins. Co., 121 F.3d at 366. The burden then shifts to the Greens to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the Greens fail to establish a factual dispute on an essential element of their § 1981 claim, the Court will proceed to determine whether Dillard's is entitled to judgment as a matter of law on that claim. *See* E.E.O.C. v. Woodbridge Corp., 263 F.3d 812, 814 (8th Cir. 2001). To survive summary judgment, the Greens must make a sufficient showing concerning every essential element of his case on which they bear the burden of proof. Osborn v. E.F. Hutton & Co., Inc., 853 F.2d 616, 618 (8th Cir. 1988).

The summary judgment rule is intended "to isolate and dispose of factually unsupported claims" and should be applied to accomplish this purpose. Prudential Ins. Co., 121 F.3d at 366. In the interest of promoting judicial economy, summary judgment should be granted to prevent the trial of cases lacking a genuine issue of material fact. Inland Oil and Transp. Co. v. U.S., 600 F.2d 725, 728 (8th Cir. 1979).

**III.    Analysis**

The Greens filed this action pursuant to § 1981 alleging that Dillard's interfered with their right to "make and enforce contracts" because they are African-American. Section 1981 was enacted immediately after the Civil War, along with 42 U.S.C. §§ 1982 and 1983, to implement the Thirteenth Amendment's ban on slavery and the Fourteenth Amendment's guarantee of equal protection and due process in the application of state law. Runyon v. McCrary, 427 U.S. 160, 170 (1976); *See also* Jones v. Alfred H. Mayer, Co., 392 U.S. 409, 423-37 (1968) (tracing the enactment of civil rights legislation). Section 1981 provides:

(a) **Statement of Equal Rights.** All persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) **'Make and enforce contracts' defined.** For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

(c) **Protection against impairment.** The rights protected by this section are protected against impairment by non-governmental discrimination and impairment under color of State law.

The purpose of the "make and enforce contracts" provision of § 1981(a) is to prohibit discrimination in the "performance, modification, and termination of contracts" and to protect "the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." Williams v. Lindenwood Univ., 288 F.3d 349, 355 (8th Cir. 2002). Section 1981's aim is not to provide a general civility code, but rather "to remove the impediment of discrimination from a minority citizen's ability to participate fully and equally in the marketplace." Brown v. Am. Honda Motor Co., 939 F.2d 946, 949 (11th Cir. 1991) *citing* Patterson v. McLean Credit Union, 491 U.S. 164, 176 (1989); *See* Manatt v. Bank of Am., NA, 339 F.3d 792, 798 (9th Cir. 2003) (noting that Section 1981 is not a general civility code).

As the Green's § 1981 claim is based on inferences to be drawn from circumstantial evidence, it is governed by a burden-shifting analysis. Williams, 288 F.3d at 355 *citing* Carter v. St. Louis Univ., 167 F.3d 398, 401 (8th Cir. 1999). First, the Greens must put forth sufficient evidence to support a prima facie case of race discrimination. Id. A prima facie case of race discrimination requires the Greens to prove that: (1) they are members of a racial minority; (2) Dillard's intended to discriminate against them on the basis

8

of their race; and (3) the discrimination concerned an area enumerated by the statute. Id. If the Greens establish a prima facie case of race discrimination, the burden then shifts to Dillard's to offer a non-discriminatory reason for its actions to rebut the presumption of race discrimination. Id. *citing* Carter, 167 F.3d at 401. The burden then shifts back to the Greens to show that the reason proffered by Dillard's was a pretext for unlawful discrimination. Id.

Here, Dillard's argues that summary judgment is proper because the Greens have failed to present sufficient evidence that the alleged discrimination concerned an area enumerated by § 1981, i.e., the making and enforcement of contracts.[4] Dillard's contends that the Greens made and enforced a contract with Dillard's for the purchase of the purse and there is no evidence that Dillard's would not have also engaged in a contract with the Greens for the sale of the watch. (Doc. #129). The Greens argue that the purchase of the purse and the purchase of the watch should be viewed as a single transaction and because the Greens did not purchase the watch, the Greens were prevented by McCrary's conduct and comment from entering into a contract with Dillard's. (Doc. #134). Alternatively, if the Court considers the purchase of the purse and purported purchase of the watch as two separate retail sales contracts, the Greens argue that the purchase of the purse was not completed because although the check had been tendered and accepted by Dillard's, the funds had not yet been electronically transferred. Id. Under this theory, the Greens further argue that the purchase of the watch was undisputably not completed and McCrary's conduct and

---

[4]Dillard's also argues that it is entitled to summary judgment because the Green's have failed to prove that Dillard's intended to discriminate against them on the basis of their race. (Doc. #129). However, because the alleged discrimination clearly does not concern an area enumerated by § 1981, this Court will not decide whether the Greens have put forth sufficient evidence to create a genuine issue of material fact as to whether Dillard's intended to discriminate against them on the basis of their race.

9

comments interfered with their ability to complete that retail sale contract. Id. Finally, the Greens argue that McCrary's initial refusal to assist them gives rise to Dillard's liability under § 1981. Id.

The Eighth Circuit has held that "§ 1981 does not provide a general cause of action for race discrimination, if in fact it occurred." Youngblood v. Hy-Vee Food Stores, Inc., 266 F.3d 851, 855 (8th Cir. 2001). "The requirement remains that a plaintiff must point to some contractual relationship in order to bring a claim under § 1981." Id. "A claim for interference with the right to make and enforce a contract must allege the actual loss of a contract interest, not merely the possible loss of future contract opportunities." Morris v. Office Max, Inc., 89 F.3d 411, 414-15 (7th Cir. 1996) *citing* Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262 (10th Cir. 1989). An allegation of "the mere possibility that a retail merchant would interfere with a customer's right to contract in the future" is insufficient to support recovery under § 1981. Arguello v. Conoco, Inc., 330 F.3d 355, 358 (5th Cir. 2003) *quoting* Morris v. Dillard Dep't Stores, Inc., 277 F.3d 743, 752 (5th Cir. 2001). Instead, the plaintiff "must offer evidence of some tangible attempt to contract" that in some way was "thwarted" by the defendant. Id.

Youngblood articulates the law in the Eighth Circuit for § 1981 claims arising in the retail context. In Youngblood, an African-American customer sued a grocery store alleging that the store violated his rights under § 1981 when it took the customer's recently purchased can of beef jerky on suspicion that the customer had crammed the contents of one beef jerky container into the container of beef jerky that he purchased. Youngblood, 266 F.3d at 853-54. The district court granted summary judgment in favor of the grocery store and the customer appealed. Id. On appeal, the Eighth Circuit considered whether any contractual relationship remained after the customer had completed his purchase of the beef jerky and if the taking of the beef jerky denied the customer a benefit of the contractual relationship. Id. at 854. The

10

Eighth Circuit recognized that there is "scant precedent" on the question of whether a contractual relationship remains in a retail sales transaction after the item is "purchased." Id. The Eighth Circuit concluded that no contractual duty remained after the customer purchased the beef jerky, finding that "[o]nce [the customer] paid the cashier and received the beef jerky from the cashier, neither party owed the other any duty under the retail-sale contract." Id.

This Court recently interpreted and applied Youngblood to a case involving the alleged theft of a peach. In Thomas v. Save-A-Lot, 2006 WL 42180, *6 (W.D. Mo. Jan. 6, 2006), two African-American customers sued a grocery store alleging that the store violated their rights under § 1981 by engaging in conduct that was so "unbearable" that the customers were "forced to relinquish their contract rights." After purchasing their groceries, one of the customers was accused of stealing a peach. Id. at *1. A security guard asked her to empty her pockets, but no peach was found. Id. The customers demanded an apology and told the white security guard that he wouldn't treat them this way if they were white or if he was black. Id. at *2. The security guard then told the customers to bag their groceries and leave the store. Id. The customers asked to talk to a manager and then asked for their money back. Id. While the refund was being processed, one of the plaintiff-customers engaged in a verbal altercation with the security guard wherein she called him a "white racist motherfucker" and he called her a "black bitch." Id. This engage of words subsequently escalated into a physical altercation. Id. at *3.

Adhering to the precedent of Youngblood, this Court concluded that no contractual relationship existed after the customers purchased their groceries and, therefore, § 1981 was not violated by the subsequent conduct of the security guard. Id. at *6-7. The Court rejected the argument that the conduct of the security guard was so "unbearable" that the customers were "forced to relinquish their contract

11

rights" in violation of § 1981 finding that the argument lacked legal and factual support. Id. at *7. The customers were permitted to purchase their groceries and the customers were permitted to return their groceries. Id. Accordingly, this Court concluded that there was no interference with the customers' right to make and enforce contracts and the customers were not denied a benefit of a contractual relationship. *See* Id.

Like the customers in Youngblood and Thomas, the Greens selected the items they wanted to purchase. The Greens gave the items to Aguero to total and record in Dillard's cash register. After the merchandise was totaled, Mr. Green paid for the items. Aguero then sat the bag containing the purchased items on the counter for the Greens to pick up. Dillard's argues that the sale was completed and the items were purchased at this time. This Court agrees. In Youngblood, the Eighth Circuit found that the retail sales transaction was complete, and neither party owed a further duty to the other, when the beef jerky was paid for and given to the customer. In Thomas, this Court found that the retail sales transaction was complete after the customers purchased their groceries, even though they were responsible for bagging the groceries themselves. Accordingly, adhering to the precedent of Youngblood and Thomas, this Court finds that the purchase of the purse and accessories was complete at the time the Greens tendered payment and the bag containing the items was set on the counter for the Greens to pick up.

The Greens argue that the purchase of the purse was not complete at that time because Mr. Green subsequently demanded return of his check before the funds had electronically transferred from Mr. Green's account to Dillard's account. The Greens cite no legal authority for their position that a purchase is not complete until funds have electronically transferred to the retailer's account. A finding by this Court that the electronic transfer of funds is required for a purchase to be complete would contradict the

12

precedent of Youngblood and Thomas.  In Youngblood and Thomas, the customers paid for their items with cash which had not yet been deposited in the retailer's account at the time the merchandise was either repossessed or returned.  Had the courts in Youngblood and Thomas intended that the actual transfer of funds signal the completion of a purchase, then these courts would have concluded that the customer's contractual rights survived the tender of money in exchange for the receipt of goods.  As the precedent of Youngblood and Thomas precludes this Court from finding that funds must be physically transferred into a retailer's account for a purchase to be complete, the Court finds that the purchase of the purse and accessories was complete when Mr. Green tendered payment and the bag containing the items was set on the counter for the Greens to take possession of.  Accordingly, the parties' contractual obligations were satisfied at that time.

The Greens further argue that Dillard's is liable under § 1981 because it interfered with the making and enforcing of a contract for the sale of a watch.  The Greens argue that McCrary's comment and conduct prevented them from purchasing the watch and therefore Dillard's interfered with their right to make and enforce a retail sales contract. Despite McCrary's comment and conduct, another Dillard's sales clerk, Aguero, willingly sold the Greens the purse and corresponding accessories and was actively assisting Mrs. Green at the time of McCrary's statement.  There is absolutely no evidence in the record to suggest that had the Greens sought to purchase the watch, Aguero would have refused to sell the watch to them on the basis of their race.  Rather, the Greens chose not to purchase the watch.

In a closely analogous case, Bagley v. Ameritech Corp., 220 F.3d 518, 521-22 (7th Cir. 2000), the Seventh Circuit held that a retail customer is not denied a contract when the customer voluntarily abandons a retail sales transaction despite the fact that another employee has offered to assist the customer.

13

In Bagley, an African-American customer entered a retail store with the intention of purchasing a cordless telephone which he had seen advertised in local media. Bagley, 220 F.3d at 519. The customer asked a clerk whether the cordless telephone he had seen advertised was still in stock. Id. at 519-20. The clerk asked the assistant sales manager who was standing nearby. Id. at 520. The assistant sales manager responded, "I will not serve him," gave the customer "the finger," and handed the clerk a brochure about the phone. Id. The customer was offended and left the store, believing that the assistant sales manager acted this way because of his race. Id. The customer subsequently returned to get the name of the clerk as a "witness." Id. The clerk provided the customer with his name and then asked him if he needed further assistance in making a purchase. The customer declined and left the store. Id. As he was leaving the store, the assistant sales manager again gave him "the finger." Id.

The district court granted the retailer's motion for summary judgment on the customer's § 1981 claim finding that because the customer decided not to purchase the phone at the time when the assistant sales manager told him that she would not serve him and he did not attempt to buy the phone after the comment was made, the customer "could not point to a specific contract that [the retailer] denied him." Id. On appeal the Seventh Circuit affirmed the district court's grant of summary judgment in favor of the retailer finding:

> While we do not fault [the customer] for taking offense at [the assistant manager's] conduct . . . her actions cannot be construed as anything more than a refusal to personally wait on [the customer]. She did not say "We will not serve you," nor did she in any way instruct [the clerk] to deny [the customer] service. Rather, it is clear that when she handed [the clerk] the brochure she intended that he would continue to wait on [the customer]. [The customer] cut off the exchange – and thus the opportunity to buy the phone – by leaving the store. Further, even if there were any lingering doubt that [the assistant manager's] behavior meant something other than that she would not wait on [the customer]

14

> herself, [the clerk's] offer to help [the customer] make a purchase upon his return later that day definitively establishes that [the retailer] would have sold [the customer] the phone.

Id. at 521-22.

Similarly, the Greens understandably took offense at McCrary's comment and conduct. However, when the Greens initially approached McCrary seeking assistance she did not say, "*We* will not serve you," and she did not prevent Aguero from assisting the Greens. After completing the purchase of the handbag and coordinating accessories, the Greens voluntarily cut off the exchange – and the opportunity to purchase the watch – by leaving the store. If there was any question about Dillard's willingness to engage in a retail sales transaction with the Greens, Bousum's offer for the Greens to return to the store and purchase the items at a discount definitively establishes that Dillard's would have sold the Greens the watch or any other merchandise they wished to purchase.

Relying on the concurring opinion in Bagley, the Greens argue that their case is distinguishable because in Bagley "there was no apparent or inferable linkage between the offensive conduct and race." (Doc. #134). The Greens cite the concurring opinion for the proposition that "the ruling would have been different had the customer been the target of an overt racial insult." Id. Although the concurring opinion observes that "there may well not be an adequate showing here of racial animus," it does not state that the case would have come out differently had the customer been the target of an overt racial insult. Bagley, 220 F.3d at 522. This Court finds that a showing of "racial animus" relates to the second element of a § 1981 prima facie case – that the defendant intended to discriminate against the plaintiff on the basis of race. Although the customer in Bagley arguably failed to prove that the retailer intended to discriminate against him on the basis of his race, the case was decided on the customer's failure to prove that the discrimination

15

concerned an area enumerated by the statute. Accordingly, the concurring opinion's postulation that the customer presented insufficient evidence of racial animus does not alter the appellate court's affirmation of the district court's decision to grant the retailer's motion for summary judgment on the grounds that the customer failed to prove that the retailer interfered with his contract rights.

## CONCLUSION

The Greens have failed to present sufficient evidence that Dillard's interfered with their right to make and enforce contracts, and enjoy all the benefits flowing therefrom, in violation of § 1981. Aguero readily sold the Greens the handbag and corresponding accessories and there is absolutely no evidence in the record to prove that had the Greens sought to purchase the watch, Aguero would have refused to sell it to them on the basis of their race. Rather, the Greens voluntarily abandoned the opportunity to purchase the watch by leaving the store and rejected a subsequent offer by Dillard's to return to the store to purchase the merchandise at a discount. The Court recognizes that McCrary's conduct was crass and grossly inappropriate; however, Dillard's cannot be liable in this case under § 1981 because the Greens have failed to prove that Dillard's "thwarted" their attempt to enter into a contract. Accordingly, the Motion for Summary Judgment filed by Dillard's is GRANTED.

**IT IS SO ORDERED.**

/s/ Gary A. Fenner
GARY A. FENNER, JUDGE
United States District Court

DATED: March 21, 2006